# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# LAFAYETTE DIVISION

| | | |
|---|---|---|
| **GERALD JAMES MARTIN** | * | **CIVIL ACTION NO. 13-2751** |
| **VERSUS** | * | **JUDGE HAIK** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993.  Gerald James Martin, born September 8, 1958, filed applications for a period of disability, disability insurance benefits, and supplemental security income on December 1, 2010, alleging disability as of December 31, 2008,[1] due to seizure disorder; history of leg, hip, and knee surgeries; leg weakness; hip and leg pain; history of stroke; affected speech; off balance; memory problems; medication side effects, and wrist and left hand pain.

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is not substantial

---

[1] The date was corrected in claimant's Disability Report.  (Tr. 159).

evidence in the record to support the Commissioner's decision of non-disability.

In fulfillment of F.R.Civ.P. 52, I find that the Commissioner's findings and conclusions regarding claimant's disability is not supported by substantial evidence, based on the following:[2]

**(1) Records from Our Lady of Lourdes Regional Medical Center ("OLOL") dated January 1, 2009 December 22, 2009**. On January 1, 2009, claimant presented with leg pain after a trailer backed into him while he was working on a farm. (Tr. 269). He sustained a distal femur fracture. On January 2, 2009, Dr. Harold Granger performed an open reduction internal fixation of his left femur. (Tr. 275).

On January 6, 2009, claimant was admitted after a fall secondary to alcohol abuse. (Tr. 243, 245). He presented with a complaint of altered mental status. (Tr. 245). He had a significant history of alcohol abuse.

Claimant appeared to be in delirium tremors. (Tr. 251). His drug screen was positive for benzodiazepine and opiates. (Tr. 253). An EEG showed nothing to suggest epilepsy or confirm a seizure disorder. (Tr. 263).

---

[2]Although all of the medical records were reviewed by the undersigned, only those relating to the arguments in the briefs are summarized herein.

Claimant suffered a fractured clavicle, a left leg fracture, and two intraparenchymal hemorrhages in the right temporal and parietal lobe. He was discharged with a followup visit to University Medical Center ("UMC"), and prescribed Dilantin, Valium and Lortab. (Tr. 243). He was also counseled on the benefits of alcohol and smoking cessation.

Claimant was referred to Dr. Ilyas Munshi for his head injuries. (Tr. 249). A CAT scan of the head showed minimal contusions to the brain. Dr. Mushi recommended seizure medication.

On December 19, 2009, claimant was admitted after falling down a flight of stairs at home. (Tr. 238). He sustained a right hip fracture and a nonoperative patellar fracture (Tr. 230, 234). He was taking Dilantin, Valium and Lortab. (Tr. 235, 238). He stated that he was no longer drinking everyday. (Tr. 234).

On December 23, 2009, Dr. Neil Romero performed an open reduction internal fixation of the right femur. (Tr. 230, 278). A nondisplaced right patella fracture was treated inoperatively in a knee immobilizer.

**(2) Records from UMC dated February 10, 2010 to March 29, 2011**. On February 10, 2010, claimant complained of left hand pain and swelling after falling while walking up the stairs the night before. (Tr. 364-65). X-rays showed

a left hand fracture. (Tr. 365). Followup x-rays taken on March 4, 2010, showed a healing fracture. (Tr. 285).

Lab results from UMC dated February 10, 2010, February 20, 2010, May 24, 2010, and February 7, 2011, indicate that claimant's Dilantin/Phenytoin levels were sub-therapeutic. (Tr. 357, 370, 375, 382). An EEG taken on March 29, 2011, was normal. (Tr. 380).

Knee x-rays taken on March 11, 2011, showed a well-healed supracondylar fracture of the distal femur. (Tr. 391). Right hip x-rays taken on March 11, 2011, were unremarkable without any significant degenerative changes. (Tr. 392).

**(3) Records from American Legion Hospital dated November 25-28, 2010**. Claimant presented to the emergency room after being found by the police department in an intoxicated condition. (Tr. 308). His alcohol level was elevated and his Dilantin level was low. (Tr. 308). He also had underlying anxiety. His medical history was also significant for a previous cerebrovascular accident two to three years prior with occasional left hemiparesis and slurred speech.

Claimant could no longer close his fist after right hand surgery. His medications included Klonopin once or twice a day and Dilantin. He stated that he smoked about a pack of cigarettes a day, and had no alcohol.

On physical examination, claimant was intoxicated with slurred speech.  He was cooperative, alert, and oriented times three.  His judgment seemed to be intact.

On extremities examination, claimant had a hand defect.  (Tr. 309).  He was unable to close his fist due to decreased range of motion at the first knuckle.

The impression was alcohol intoxication, seizure disorder with low Dilantin level, tremors which were stable, underlying anxiety, and multiple other medical problems due to his fractures, debility and inability to work.  His drug screen was negative.

Dr. Paul Stringfellow prescribed Dilantin and Klonopin, and encouraged claimant to followup at UMC.  (Tr. 325).  He recommended no driving or heavy machinery operation, and seizure precautions.

**(4) Consultative Psychological Examination by M. Lucy Freeman, Ph.D., dated April 4, 2011**.  Claimant's medications included Dilantin, Clonazepam, and OTC sleeping medications.  (Tr. 398).  He indicated that the Dilantin caused tremors in his hands.  He noted that he was prescribed Clonazepem for the tremors, but was not given enough.  He also stated that he took the "PM" medications all day long to control the shaking in his hands.

Claimant reported that he "used to drink, but don't want to anymore."  His records revealed an extensive history of alcohol abuse.  He stated that he had a

driver's license, but did not drive.

On examination, claimant was fully oriented and presented with a flat affect and an anxious mood. He exhibited fair eye contact. He had notable tremors in both hands. He held onto the wall while walking and swayed from side to side. He also held his left leg straight while walking.

Claimant had poor insight and judgment. His thought content was logical, though tangential at times. Expressive abilities were slurred and slow.

Claimant was cooperative and able to attend and concentrate throughout the evaluation. He was able to follow simple directions. He appeared to have minor difficulty with his memory, especially when providing historical data.

Dr. Freeman's impression was alcohol abuse (by history), r/o dementia, and financial psychosocial stressors. (Tr. 399). His Global Assessment of Functioning score was 50.

Dr. Freeman stated that claimant's reports suggested that he might have dementia due to head trauma as evidenced by speech problems, tangential thought processes, and difficulties remembering historical data. She noted no significant emotional or behavioral problems. Claimant appeared to be able to understand and follow simple directions, and was cooperative during the assessment.

Dr. Freeman found that, based on the information provided, it was likely that claimant was "unable to manage funds without supervision." She also stated that it appeared "as though he would have severe limitations in his activities of daily life with social interactions due to his physical and cognitive problems." His prognosis was poor. She recommended further testing of IQ and memory.

**(5) Consultative Physical Examination by Dr. Mark Dawson dated March 16, 2011**. Claimant complained of some trauma in 2009, including some strokes with intraparenchymal hemorrhages in the temporal and parietal lobes and surgery for a femur fracture. (Tr. 402). He also had a history of epilepsy and alcohol abuse. He also had hand surgery for ganglion.

Claimant smoked, but denied alcohol or illicit drug use. His medications included Phenytoin and Clonazepam 1 mg. daily. He had trouble communicating, and his speech was a bit slurred.

On examination, claimant was 69 inches tall and weighed 143 pounds. His blood pressure was 130/70. His visual acuity was 20/50 OD, 20/100 OS, and 20/50 OU.

On extremities examination, claimant had weakness of his hands. (Tr. 403). He had absent reflexes in all extremities. He could not squat, walk on his toes or

walk on his heels. He had difficulty communicating his needs due to his speech problems, which was probably secondary to the strokes.

Dr. Dawson's assessment was status-post stroke with residual musculoskeletal weakness, especially in the hand, with absent reflexes; epilepsy, on medication, and status-post femur fracture.

Dr. Dawson stated that claimant had postural and environmental limitations. He opined that claimant could not climb ladders, scaffolds or work with any dangerous equipment. He noted that claimant did not have good grip strength, which must be taken into consideration when considering his employment.

**(6) Claimant's Administrative Hearing Testimony**. At the hearing on July 17, 2012, claimant was 53 years old. (Tr. 28). He testified that he was six feet tall, and weighed about 150 pounds. (Tr. 29). He was a high school graduate.

Claimant had training for water production treatment and distribution. (Tr. 30). He had last worked in September, 2010, as a cook on a barge. Prior to that, he had worked as a water plant worker for the Town of Duson, an electrician's helper, and a meat packer.

As to complaints, claimant stated that he had stopped working as a cook because of pain. (Tr. 31). He complained of pain in his knees, hip and right wrist.

He also reported having seizures, with the last one occurring a day or two before the hearing. (Tr. 32). Additionally, he stated that he had a stroke, from which he had memory problems. (Tr. 38).

Claimant reported that he had tried to go back to work after the BP spill. (Tr. 38-39). He said that he could work because of his knees, hip, left hand and memory problems. (Tr. 39-41). He reported that he had stopped drinking in 2009 because of his medications. (Tr. 40).

Regarding activities, claimant testified that he was able to dress and shower by himself. (Tr. 32-33). He stated that he prepared sandwiches, went grocery shopping, did laundry, and washed dishes. (Tr. 33). Additionally, he visited with friends and family members. Occasionally, he watched television.

Claimant reported that he had problems sleeping. He had a driver's license, but did not drive because of the seizure medication, which he took three times a day. (Tr. 32). He said that the medications were helping. (Tr. 34).

As to restrictions, claimant testified that he could walk to the end of the driveway or the house next door. (Tr. 35). He said that he had problems sitting sometimes because of hip and knee problems. He stated that he did not have problems getting along with other people. He reported having memory problems.

**(7) Administrative Hearing Testimony of Thomas Mungall, III, Vocational Expert ("VE")**.  Mr. Mungall classified claimant's past work as a water plant operator as medium and skilled; an electrician's helper as medium and semi-skilled, and an offshore cook as medium and skilled.  (Tr. 43).  The ALJ posed a hypothetical in which he asked the VE to assume a claimant of the same age, education, and vocational experience; who was limited to light work with limitations as to seizure restrictions, meaning no working at heights, with dangerous or moving machinery, and driving, and was restricted to simple, unskilled work.

In response, Mr. Mungall opined that claimant could not do his past work, but could work as a housekeeping cleaner, of which there were 865,960 positions nationally and 14,530 statewide, and information clerk, of which there were 997,080 jobs nationally and 19,240 statewide.  (Tr. 44).

When the ALJ changed the hypothetical to assume a claimant who would miss work on an irregular basis, the VE testified that there were no jobs that such person could perform.

**(9) The ALJ's Findings**.  Claimant argues that: (1) the ALJ erred in finding that claimant's problems were only moderate in limitation; (2) the ALJ failed to meet the burden of proof to support a conclusion that claimant could make an

adjustment to other work; (3) the ALJ failed to consider claimant's inability to sustain work activity on a regular basis based on the vocational expert's testimony. Because I find that the ALJ should have ordered further IQ and memory testing as suggested by Dr. Freeman, I recommend that this matter be **REMANDED**.

First, claimant argues that the ALJ erred in finding that he did not have severe limitations. Specifically, he asserts that the ALJ failed to consider Dr. Freeman's finding that he would have severe limitations due to his dementia.

The ALJ found that claimant had severe impairments of seizure disorder and organic brain impairment. (Tr. 13). He evaluated claimant's alleged mental impairments under §§ 2.00 (speech) and 11.00 (seizures and central nervous system deficits) of the listing of impairments.

While the ALJ gave "significant weight" to some of Dr. Freeman's conclusions, he did not give any reason for rejecting the rest of them when applying the "special technique." (Tr. 16-17). He cited her findings that claimant presented with a flat affect and anxious mood; had poor insight and judgment; had logical thought content, though tangential at times; had slurred and slow expressive abilities, and was able to attend and concentrate throughout the examination, but had a minor difficulty with memory. (Tr. 16). He also noted her diagnosis of "alcohol abuse by history with *possible dementia* resulting

11

therefrom." (emphasis added).

Further, the ALJ cited Dr. Freeman's finding that claimant appeared to be able to understand and follow simple directions, but would be unable to manage funds without supervision. He even cited her opinion that claimant "would have *severe limitations* in his activities of daily life and with social interactions due to his physical and cognitive problems," and that his prognosis was "*poor*." (emphasis added).

Using the "special technique" set forth in the regulations at 20 C.F.R. §§ 404.1520a and 416.920a, the ALJ found that claimant would have "no more than a mild restriction" in activities of daily living. (Tr. 16-17). This in direct contrast to Dr. Freeman's finding that claimant would have "severe limitations" in his activities of daily life. (Tr. 399). Additionally, the ALJ found that claimant would have "mild difficulties" in social functioning, whereas Dr. Freeman determined that he would have "severe limitations" with social interactions due to his physical and cognitive problems. (Tr. 17, 399). Further, the failed to follow Dr. Freeman's recommendation that "further testing of IQ and memory" be performed. (Tr. 399).

The undersigned observes that Dr. Freeman was the consultative examiner retained by the Social Security Administration. This makes her opinion particularly reliable. *See* 20 C.F.R. § 416.927(e)(2)(ii) ("State agency medical and

psychological consultants . . . are highly qualified psychologists . . . who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists as opinion evidence").

Despite Dr. Freeman's findings that claimant would have severe limitations in activities of daily living and social functioning, the ALJ, without citing any evidence in the record, found otherwise. Additionally, Dr. Freeman recommended IQ and memory evaluation, which was not performed. Given the fact that claimant could possibly have dementia, these test results could affect his residual functional capacity.

Accordingly, the undersigned recommends that this case be **REMANDED** to the Commissioner for further administrative action pursuant to the fourth sentence of 42 U.S.C. § 405(g). This includes, but does not limit, sending the case to the hearing level with instructions to the Administrative Law Judge to order further IQ and memory testing as directed by Dr. M. Lucy Freeman. Claimant shall be afforded the opportunity to submit additional evidence and to testify at a supplemental hearing.

Inasmuch as the remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA). *See, Richard v. Sullivan*, 955 F.2d 354, 356 (5th Cir. 1992) and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN FOURTEEN (14) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE**

**LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.** *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996); *U.S. EX REL. STEURY V. CARDINAL HEALTH, INC*., 735 F.3D 202, 205, N. 2 (5TH Cir. 2013).

Signed March 7, 2015, at Lafayette, Louisiana.

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE

COPY SENT
DATE: 3/9/2015
BY: cgc
TO: RTH, pj